**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RICK OCHOA, Individually and on Behalf of all Persons Similarly Situated, ) ) ) | No. _____ |
| Plaintiff, ) ) | |
| v. ) ) | |
| STATE FARM LIFE INSURANCE COMPANY, ) ) ) | |
| Defendant. ) ) | |

**<u>CLASS ACTION COMPLAINT AND JURY DEMAND</u>**

Plaintiff Rick Ochoa ("Plaintiff"), by and through his counsel, individually and on behalf of other persons similarly situated (the "Class" defined in ¶ 40), alleges the following facts and asserts the following claims against Defendant State Farm Life Insurance Company ("State Farm") based upon personal knowledge as to matters relating to himself, and upon information and belief as to all other matters based upon the investigation of counsel:

## INTRODUCTION

1.       State Farm has failed to pay the full amount of annual policy dividends contractually owed to Plaintiff and its other participating policyholders.  The underpayment of participating policyholder dividends is the direct result of State Farm's annual retention of surplus (*i.e.*, its retained profits) far in excess of a statutory limit that is incorporated as a matter of Illinois law into State Farm's standardized policy contracts ("the Illinois Contingency Reserve Law").  For an insurer of State Farm's size, withheld surplus may not exceed its statutory reserves plus a 10% cushion for unforeseen contingencies (the "contingency reserve").   215 ILCS 5/243(1)(b). Because State Farm's retained surplus grossly exceeds this limit, Plaintiff asserts a breach of contract claim against State Farm, individually and on behalf of a class of similarly situated participating policyholders.

2.       Alternatively, in Count Two Plaintiff individually seeks declaratory relief adjudicating the nature and scope of State Farm's obligations under the Illinois Contingency Reserve Law, including specifically under 215 ILCS 5/243(1)(b).

## PARTIES

### PLAINTIFF

3.       Rick Ochoa is a citizen of the State of California.  Plaintiff is the owner of the following State Farm participating life insurance policies: a) a policy insuring his life issued on October 28, 1989, b) a policy insuring the life of his child, Dezzari L. Ochoa, issued on March 8, 1996, c) a policy insuring the life of his grandchild, Peter C. Bigner, issued on March 8, 1996, d) a policy insuring the life of his grandchild, Brandon Bigner, issued December 5, 1997, and e) a policy insuring the life of his grandchild, Abbygail Payten Vernon, issued on June 26, 2012.  Each

of these State Farm participating life insurance policies are currently in-force, contain provisions providing for the payment of dividends, and currently pay annual dividends.

**DEFENDANT**

4.     State Farm is a corporation organized under the laws of Illinois. State Farm's principal office and principal place of business is in Bloomington, McLean County, Illinois.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(d) ("CAFA"). The amount in controversy for the Class exceeds $5 million, exclusive of costs and interest; the class will have 100 or more members; and there is minimal diversity between State Farm and at least one member of the Class.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(a), because State Farm is headquartered in Illinois, has transacted business in Illinois, and a substantial part of the events or omissions giving rise to Plaintiff's and the Class' claim occurred in Illinois.

## SUBSTANTIVE ALLEGATIONS

### Historical and Factual Background

7.     Participating life insurance is a brilliant concept – often attributed to Benjamin Franklin – by which policyholders have a right to share, or "participate," in the profits generated on their business.  When a life insurance company issues participating life insurance policies, it holds and invests the policyholders' premiums (and any starting capital) in a common fund from which it establishes policy reserves sufficient to more than cover the insurance company's anticipated liabilities (such as death claims and operating expenses).  The common fund also includes surplus (the retained profits) which serves as a source of additional protection against unanticipated liabilities.

8.     Participating policies afford the policyholders a right to the payment of periodic (usually annual) dividends. These policy dividends represent (a) a refund of overcharges on premium, (b) a benefit payment provided for in the premium, (c) a share in the earnings, or (d) a

combination of these items. The "divisible surplus" is the aggregate amount available to be distributed to policyholders as dividends.

9.     The participating policyholder's right to return of the divisible surplus is the fundamental feature that distinguishes participating insurance (which is typical of mutual insurance) from other forms of insurance.  The U.S. Supreme Court aptly described the nexus between dividends and participating insurance, in that instance for policies issued by a mutual life insurer:

> In a mutual company, whatever the field of its operation, the premium exacted is necessarily greater than the expected cost of the insurance, as the redundancy in the premium furnishes the guaranty fund out of which extraordinary losses may be met, while in a stock company they may be met from the capital stock subscribed. ***It is of the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policy holder.***

*Penn Mutual Life Ins. Co. v. Lederer*, 252 U.S. 523, 525 (1920) (emphasis added).  As the Supreme Court recognized, the payment of dividends "are, in a sense, a repayment of that part of the premium previously paid which experience has proved was in excess of the amount which had been assumed would be required to meet the policy obligations (ordinarily termed losses) or the legal reserve and the expense of conducting the business." *Id.* at 524.

10.     Responsibility for apportioning and distributing the divisible surplus was at one time left solely to the business judgment of an insurance company's management.  However, there exists an undeniable natural tension between the interests of the participating policyholders (in the return of surplus in excess of that required to meet policy obligations) and the interests of management (which has a tendency to over-retain or "hoard" the surplus). Because of this fundamental conflict of interest, life insurance companies issuing participating policies are subject to limitations on the amount of surplus that may be withheld from its participating policyholders.

11.     In the early part of the 20th century, New York's Armstrong Committee Investigation found widespread "wastefulness, speculation and corruption" with respect to surplus that had been hoarded by the largest New York-based mutual life insurance companies.  *See, e.g.,* WILLIAM PRICE, LIFE INSURANCE REFORM IN NEW YORK at 70 (1909) ("Much of the

huge surpluses which a number of companies had accumulated by curtailing dividends was being wasted and dissipated by extravagant commissions on the one hand, and unprofitable investments on the other. That there was plausible excuse for limitation upon the amount of undivided surplus, or contingency reserve as it is now called in New York, cannot be disputed.").

12.     In further response to the hoarding scandal, and while the Armstrong Committee was drafting its report, a group of Governors and Insurance Commissioners convened a national insurance convention to draft uniform insurance regulatory legislation. The convention was held in Chicago in February 1906. During the Convention, the members appointed a "Committee of Fifteen" (composed of fifteen governors and insurance commissioners and eight advisers) to draft model uniform insurance laws. At the end of the February meeting, the Convention formally adopted a set of principles to guide the Committee's drafting, including specifically principles regarding the annual apportionment and repayment of all surplus to participating policyholders except for a "contingency" or "safety" reserve:

> With respect to all future policies there should be an annual accounting of the surplus, an apportionment, to begin at a proper time after the issuance of the policy, to **each policy holder of his share of the entire surplus of the preceding year after reserving a reasonable margin of safety**, and an option on the part of the policyholder to withdraw his share in money.

(Emphasis added.)

13.     The Committee of Fifteen met over the course of the year and produced a report in December 1906 that contained model legislation, including a model bill to require an annual apportionment and distribution of divisible surplus ("the Model Bill").[1] The Model Bill had two subsections: Section 1 confirming the participating policyholders' annual right to return of divisible surplus, and Section 2 fixing a limit on the amount of surplus that may be withheld from the participating policyholders as a "contingency reserve."

14.     The Armstrong Committee Report and the Committee of Fifteen's Model Bill led to the enactment of so-called "safety fund" statutes in a number of states, requiring that insurance

---

[1] *See* Report of Committee of Fifteen, set forth as Exhibit 151 in *Testimony taken before the Select Committee of the State of New Jersey*, Vol. III, at 51-52 (1906).

companies annually apportion and distribute the divisible surplus to their participating policyholders, and setting a statutory annual limit on the amount of surplus that company management could withhold from its participating policyholders as a contingency reserve cushion.[2]

15.     Some such statutes, like those enacted in Massachusetts and Pennsylvania, set a flat percentage limit on the amount of surplus that could lawfully be withheld as the contingency reserve; others, like New York's initial enactment, followed the Model Bill's use of a sliding scale to determine the company's permissible contingency reserve.  Regardless of how the statutory limit was set, under such legislation the surplus in excess of the statutory limit must be returned to the participating policyholders.  *See, e.g., Goldstein v. Savings Bank Life Ins. Co. of Mass.*, 761 N.E.2d 938, 942 (2002) (stock insurance company that had issued participating policies must, by annual dividend, distribute to the participating policyholders any surplus over the Massachusetts statutorily defined safety fund limit); *Goldstein v. Savings Bank Life Ins. Co. of Mass.,* No. 98-2330-BLS2, 21 Mass. L. Rptr. 204, 2006 WL 1720153, at \*3 (Mass. Super. Ct., Apr. 7, 2006) ("Once the … threshold has been reached in its Safety Fund, whatever 'surplus funds or profits' that remain ***must be returned to its policyholders*** in additional dividends unless the Commissioner specifically authorizes it to keep a greater amount in the Safety Fund 'for cause shown.'") (emphasis added).

16.     The forgoing safety fund legislation was enacted notwithstanding insurance industry objections that fixing a statutory limit on the amount of the contingency reserve necessarily curtailed the company's business judgment and otherwise broad discretion over the timing and amount of dividends to be paid to participating policyholders.  For example, the New

---

[2] *See e.g.,* GEN. LAWS OF THE STATE OF MINN. PASSED DURING THETHIRTY-FIFTH SESS. OF THE STATE LEG. § 2 (1907); LAWS, RES. AND MEMORIALS OF THE STATE OF MONT. PASSED AT THE TENTH REGULAR SESS. OF THE LEGIS. ASSEMB. § 2 (1907); LAWS PASSED AT THE TENTH SESS. OF THE LEGIS. ASSEMB. OF THE STATE OF N.D.§ 2 (1907); ACTS OF THE GEN. ASSEMBLY OF THE STATE OF TENN. PASSED BY THE FIFTY-FIFTH GEN. ASSEMB. § 2 (1907); GEN. LAWS OF THE STATE OF TEX. PASSED AT BY THE THIRTY FIRST LEG. AT ITS REGULAR SESS. § 6 (1909); ACTS OF THE LEG. OFW. VA., REGULAR AND EXTRA SESS. § 2 (1907).

York Chamber of Commerce complained to Governor Hughes in 1909 that the contingency reserve established in New York "places a limit on safety and is taking away from the governmental bodies of the company the power of determining what amount of surplus is necessary for the protection of its policy."[3]

17.    In 1937 the Illinois General Assembly enacted its version of the Model Bill proposed by the Committee of Fifteen, the Illinois Contingency Reserve Law, as part of the state's insurance code.  Laws of the State of Illinois 1937, Article 14.

18.    Like the safety fund laws enacted in other states, in the Illinois Contingency Reserve Law, the General Assembly set a statutorily prescribed percentage limit on the maximum amount of surplus a domestic insurance company may withhold from its participating policyholders in the form of a "contingency reserve":

> Contingency Reserves. (1) Any domestic life company may accumulate and maintain in addition to an amount equal to the net value of its participating policies computed according to the standard adopted by it under section 223, *a contingency reserve not exceeding the following respective percentages of said net values*, ….

215 ILCS 5/243 ("Section 243") (emphasis added).  The complete text of Section 243 is attached as Appendix A.

19.    Section 243 closely tracks Section 2 of the Model Bill; although the numbers differ, both calculate the contingency reserve limit as a sliding scale percentage of the "net value of its participated policies" calculated in accordance with state law (known in the industry as the "legal reserves"). For Illinois-domiciled life insurance companies with at least $15 million in participating legal reserves, subsection (1)(b) of Section 243 fixes the statutory limit on withheld participating surplus to no more than 10% of its legal reserves.  215 ILCS 5/243(1)(b).

20.    Notably, consistent with Section 1 of the Model Bill, the Illinois Generally Assembly as part of the same 1937 legislation furthermore enacted 215 ILCS 5/224(1)(e) ("Section 224"), confirms the participating policyholders' right to the annual ascertainment and distribution

---

[3] Asks for Immediate Action: Committee of New York Chamber of Commerce Make Demand on Governor Hughes, 19 THE INSURANCE FIELD, January 14, 1909, at 22.

of divisible surplus.  However, Section 224 goes *further* than the Model Bill: entitled "Standard provisions for life policies," Section 224 not only confirms that the participating policyholder "shall participate annually in the surplus of the company," it makes that right *contractually enforceable*.

21.    Specifically, Section 224 mandates a contractual provision be included in each participating policy "issued or delivered" in Illinois guaranteeing the participating policyholder the contractual right – "each year" – to receive his, her or its share of divisible surplus "either paid in cash, or applied in reduction of premiums, or applied to the purchase of paid-up additional insurance, or be left to accumulate to the credit of the policy, with interest at such rate as may be determined from time to time by the company, but not less than a guaranteed minimum rate specified in the policy…." 215 ILCS 5/224(1)(e).  State Farm has included the contractual language mandated by Section 224 in all of its participating policies, wherever they are issued or delivered. The complete text of Section 224 is attached as Appendix B.

22.    Insurance policy contracts subject to Section 224 must as a matter of law be read in conformity with its statutorily mandated policy provisions.  *Holloway v. J.C. Penney Life Ins. Co.*, 190 F.3d 838, 844 (7th Cir. 1999); *see also*, *Lauer v. Am. Fam. Life Ins. Co.*, 769 N.E.2d 924, 926 (Ill. 2002) (Section 224 "sets forth the standard provisions required in life insurance policies issued in Illinois").

23.    The mandatory contractual provisions of Section 224 incorporated into State Farm's participating policy contracts are not waivable by either the insurance company or the policyholder.  215 ILCS 5/232.

24.    Furthermore, any attempt by an insurance company to dilute or diminish statutory provisions applicable to its contract of insurance is ineffective as contrary to Illinois public policy, and any conflict between statutory and policy provisions must be resolved in favor of the statutory provisions.  *DC Elecs., Inc. v. Employers Modern Life Co.*, 413 N.E.2d 23, 28 (Ill. App. 1980); *Bertini v. State Farm Mutual Auto. Ins. Co.*, 362 N.E.2d 1355, 1358 (Ill. App. 1977) (policy

provisions that are contrary to the insurance code are void even if approved by the Director of the Illinois Department of Insurance).

25.     Even absent the mandatory contractual provision required by Section 224, the requirements of the Illinois Contingency Reserve Law are, like other pertinent provisions of the Illinois insurance code, in any event incorporated as a matter of law into the participating policyholders' contracts. *Bellmer by Bellmer v. Charter Sec. Life Ins. Co.*, 488 N.E.2d 1338, 1340 (Ill. App. 1986) (statutory provisions applicable to a contract of insurance, and in force at the time of its making, form a part of such contract and should be construed in connection with the policy); *DC Elecs., Inc. v. Employers Modern Life Co.*, 413 N.E.2d 23, 28 (Ill. App. 1980) (same); *Konrad v. Hartford Accident & Indemnity Co.*, 137 N.E.2d 855, 860-61 (Ill. App. 1956) (same); *see generally*, *Franey v. State Farm Mut. Auto. Ins. Co.*, 285 N.E.2d 151, 154 (Ill. App. 1972) ("It [has]been the law in Illinois for many years that statutory provisions in force at the time of the making of a contract of insurance form a part of such contract and are to be construed in connection with the policy of insurance.").

26.     Therefore, as noted above, the rights and interests of participating policyholders to divisible surplus "are contractual in nature and are measured by their policies and by the statutes, charter, and by-laws which comprise their contracts." *Lubin v. Equitable Life Assuramce Soc. of United States*, 61 N.E. 2d 753, 756 (Ill. App. 1945).

<u>**Specific Allegations**</u>

27.     State Farm is an Illinois domestic life company within the meaning of 215 ILCS 5/2(f).

28.     State Farm issues and delivers exclusively participating insurance policies from its home office in Illinois, including the participating policies issued to Plaintiff and, upon information and belief, to more than 7 million other current participating policyholders.

29.     State Farm's standardized form of participating policy contracts include the provisions required by Section 224 making the policy eligible for the payment of annual dividends. For example, Plaintiff's policies issued in 1996 and 1997 expressly provide:

**Annual Dividends.** We may apportion and pay dividends each year. Any such dividends will be paid only at the end of the policy year. There is no right to a partial or pro rated dividend prior to the end of the policy year. Such dividends will not be paid if all premiums due have not been paid or if the Basic Plan is in force as extended term insurance.

30.     Also, the Illinois Contingency Reserve Law, Section 243, is as a matter of law incorporated into State Farm's policy contracts with its participating policyholders. Indeed, the contractual provisions set forth in Paragraph 30 above, which are contained in all State Farm participating policies, impliedly and necessarily incorporate the requirements and limitations imposed by Section 243 because the "divisible surplus … allocated to [each] … policy as an annual dividend" in accordance with the contract language is determined by application of the statutorily prescribed percentage limit on the maximum amount of surplus a domestic insurance company may withhold from its participating policyholders in the form of a "contingency reserve".

31.     In addition, the Illinois Contingency Reserve law is incorporated into State Farm's policy contracts with its participating policyholders by virtue of Article VIII of State Farm's bylaws, which expressly makes the discretion of its Board of Directors to calculate surplus with respect to both the contingency reserve and dividends to participating policyholders "[s]ubject to the limitations provided by law." BY-LAWS OF STATE FARM LIFE INSURANCE COMPANY (Amended as of March 13, 2000), Article VIII.

32.     State Farm (like all other insurers) is required by its domiciliary state to file an Annual Statement each year containing detailed information about its financial condition for the prior year(s), based on the financially-conservative Statutory Accounting Principles ("SAP") basis. Illinois law also requires that this information be prepared in accordance with the requirements of the National Association of Insurance Commissioners ("NAIC"). *See* 215 ILCS 5/136. In addition, Illinois law requires that the accuracy of the information be attested to by its senior management. *Id*. State Farm's senior executives have so attested for each year of its operations. *See, e.g.,* Jurat to 2016 Annual Statement.

33.     Based on this reported financial information, State Farm's contingency reserve exceeded the Illinois Contingency Reserve Law's 10% limit in each of the last 10 years (each year

9

being calculated on a stand-alone basis). The 10% limit is computed by taking the State Farm's annual surplus and dividing it by its annual permitted legal and contingency reserves under Section 243. Surplus is reported in the Annual Statements at page 3, line 38, as required under SAP and NAIC rules. Reserves are computed in accordance with 215 ILCS 5/223 (captioned "Director to value policies--Legal standard of valuation") and reported in the Annual Statement at page 3, lines 1 and 2. The following table for 2007 to 2016, based on the figures reported in State Farm's Annual Statements, shows State Farm's reported annual surplus and reserves, the contingency reserve percentage, and the surplus overage as a percent for each year (calculated on a stand-alone basis):

| Year | Reported Surplus | Reported Reserves | Contingency Reserve | Surplus Overage |
|------|------------------|-------------------|---------------------|-----------------|
| 2007 | $ 5,252,532,056 | $ 27,172,407,294 | 19.3% | 9.3% |
| 2008 | $ 5,057,054,443 | $ 29,296,430,255 | 17.3% | 7.3% |
| 2009 | $ 5,659,639,594 | $ 31,192,161,323 | 18.1% | 8.1% |
| 2010 | $ 6,199,446,449 | $ 32,980,865,388 | 18.8% | 8.8% |
| 2011 | $ 6,795,390,590 | $ 34,726,186,868 | 19.6% | 9.6% |
| 2012 | $ 7,535,241,785 | $ 36,514,400,036 | 20.6% | 10.6% |
| 2013 | $ 8,441,656,364 | $ 38,535,683,305 | 21.9% | 11.9% |
| 2014 | $ 8,998,105,691 | $ 40,607,581,965 | 22.2% | 12.2% |
| 2015 | $ 9,556,920,365 | $ 42,739,681,800 | 22.4% | 12.4% |
| 2016 | $ 10,174,269,825 | $ 44,979,809,093 | 22.6% | 12.6% |

34.     Although Section 243 permits the Illinois Insurance Commissioner to allow domestic life insurers to accumulate surplus in excess of the 10% limit "for cause shown" in a given year "for a prescribed period not exceeding one year under any one permission," no such permission was ever sought or obtained by State Farm or published as required by Section 243 in the Commissioner's annual report. As a result, the amounts over the Illinois Contingency Reserve Law limit became due and owing to the participating policyholders at the end of each year, having been effectively declared by force of law.

35.     State Farm has in fact never had cause to seek permission for a one-year exception to the Illinois Contingency Reserve Law, given its financial strength even had it complied with its contractual dividend obligations under Sections 224 and 243.  Thus, there is no justification, let alone need, for State Farm to fail to pay its participating policyholders the dividends to which they are entitled under their contracts in accordance with the Illinois Contingency Reserve Law.

36.     Nevertheless, over at least the past ten years State Farm has not heeded Section 243 and its contractual dividend obligations to its participating policyholders, thereby amassing a huge and growing surplus while its rate of dividend pay-out to the participating policyholders has remained virtually flat:



37.     As a result, State Farm's dividend payments as a percentage of surplus has declined (nearly by half) in the last ten years:



This has caused State Farm to exceed the applicable contingency reserve limit by ever increasing amounts, e.g., from 9.3% in 2007 to 12.6% in 2016.

38.     State Farm has thus breached its participating policy contracts by withholding from the participating policyholders surplus far in excess of the limits established under Illinois law and incorporated into its participating policy contracts.

39.     Plaintiff, as a current participating policyholder, has standing to enforce the mandatory contractual provisions prescribing State Farm's apportionment and distribution of divisible surplus in compliance with the Illinois Contingency Reserve Law.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure seeking to represent a class of all persons presently holding in-force participating insurance policies issued by State Farm (the "Class"). Excluded from the Class are State Farm's directors and senior management, and any entity related to or affiliated with State Farm and the legal representatives, heirs, successors-in-interests or assigns of any such excluded entity, and this Court and its personnel.

41.     The members of the proposed Class are so numerous and geographically dispersed that joinder of all members is impracticable.  State Farm has issued participating policies to

Plaintiff and, upon information and belief, over 7 million other members of the Class. Members of the Class can be identified from the records maintained by State Farm and they can be notified of the pendency of this action by mail using a form of notice similar to that customarily used in other class actions.

42.  Plaintiff will fairly and adequately represent and protect the interests of all members of the Class.  Plaintiff has retained competent counsel experienced in policyholder class action litigation in both state and federal courts nationwide – including an action based on the same causes of action alleged herein – and intends to prosecute this action vigorously.

43.  Plaintiff's claims are typical of those of the other members of the Class because (a) each has a participating policy imbued with identical rights to annual dividends and/or with substantially identical language supporting his/her claim, and (b) the harm sustained by Plaintiff and all of the members of the Class arises from and was caused by the same course of conduct in which State Farm engaged.  Plaintiff does not have interests that are antagonistic to or in conflict with the Class.

44.  Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class.  Common questions include:

(a)  whether the Illinois Contingency Reserve Law is incorporated into the participating policy contracts issued by State Farm to Plaintiff and the other members of the proposed Class;

(b)  whether the contingency reserve held by State Farm exceeded the limit of the Illinois Contingency Reserve Law,

(c)  whether State Farm thereby breached its contracts with Plaintiff and the other members of the proposed Class; and

(d)  whether State Farm's breach has caused Plaintiff and the other members of the Class to suffer damages, and if so, the proper measure of such damages.

45.     Common questions of law or fact predominate over individual questions because policyholders are all similarly adversely affected by State Farm's alleged breach of its standardized policy contracts.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the harm suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for the members of the Class individually to seek redress for the wrongful conduct alleged.  Moreover, absent class treatment, there is a high risk of inconsistent judgments by different courts hearing the identical claims of over 7 million policyholders. which would be dispositive of at least some of the issues and hence interests of the other members not party to the individual actions, would substantially impair or impede their ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the class.  Also, the Class may be certified because State Farm has acted or refused to act on grounds generally applicable to each member of the respective Class, thereby making declaratory relief appropriate.

47.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation to preclude its maintenance as a class action, particularly given the lack of choice-of-law issues. Indeed, a class action presents far fewer litigation management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## THIS COURT HAS PRIMARY JURISDICTION

48.     Plaintiff's complaint raises legal questions of contractual rights that are squarely within the province of the Court to adjudicate. *Employers Mutual Cos. v. Skilling*, 644 N.E.2d 1163, 1165 (Ill. 1994) (Illinois courts have original jurisdiction over all justiciable matters; if a legislative enactment is to divest the courts of their original jurisdiction, "it must do so explicitly"). This is particularly so here because the contractually incorporated statutory limit of Section 243 is unambiguous and must be enforced by the Court as written. *Contl. W. Ins. Co., Inc. v. Knox County*

14

*EMS, Inc.*, 52 N.E.3d 558, 567 (Ill. App. 2016) (court had primary jurisdiction over matters of contract and statutory interpretation); *see, e.g., Goldstein I*, 2006 WL 1720153, at *14 (recognizing the Massachusetts safety fund law as "a statutory entitlement that effectively is incorporated into a contractual right benefitting policyholders").

49.     The legal issues raised by Plaintiff's contract claims are within the realm of the Court's experience, and there are no extenuating circumstances that require referral to the Illinois Department of Insurance. *Keeling v. Esurance Ins. Co.*, 10-0835-DRH, 2012 WL 699580, at *5 (S.D. Ill. Mar. 1, 2012) (rejecting primary jurisdiction argument).

50.     In particular, nothing in 215 ILCS 5/201 ("Section 201") precludes Plaintiff from seeking judicial recourse to enforce his contractual rights to divisible surplus, calculated in compliance with Section 243's limit. *People ex rel. Parkinson v. Williams*, 64 N.E.2d 464, 471 (Ill. 1945) ("The determination and enforcement of contract rights are proper matters for disposition in the courts without intervention from the Director, or Department, of Insurance."). *Central Stand. Life Ins. Co. v. Gardner*, 161 N.E.2d 278, 286 (Ill. 1959) ("policyholders have the right to enforce their contractual … rights directly in the courts, even over opposition of the Director of Insurance").

51.     Furthermore, the Illinois Legislature has in Section 224 (enacted simultaneously with Section 201 in 1937) unequivocally manifested its desire that the participating policyholders' right to an annual allocation and distribution of divisible surplus in accordance with Illinois law be ***contractually*** enforceable by the participating policyholder, by requiring that such right be included as a contractual provision in every par insurance policy issued or delivered in Illinois. The statutory limitation on the amount of surplus a domestic life insurance company may accumulate and maintain under the Illinois Contingency Reserve Law is imposed on State Farm by virtue of a mandatory provision inserted in the policy contract by operation of Section 224.

52.     A lawsuit by a policyholder requiring State Farm to comply with the requirements of the Illinois Contingency Reserve Law cannot be deemed in any sense an "interference" in State Farm's transaction of business. *Winger v. Chicago City Bank & Trust Co.*, 67 N.E.2d 265, 272

15

(Ill. 1946). To the contrary, judicial recourse is proper to require State Farm to comply with its legal duties under the Illinois Contingency Reserve Law. *Frontier Inv. Corp. v. Belleville Nat. Sav. Bank*, 254 N.E.2d 295, 298 (Ill. App. 1969) (court, not director of insurance, had jurisdiction to enforce compliance with an obligation imposed by law upon the directors of the insurance company; doing so "does not interfere with the prosecution of the insurance company's business").

## THE BUSINESS JUDGMENT DEFENSE IS INAPPLICABLE

53.     The business judgment rule is an affirmative defense that protects a corporate officer, acting reasonably in the corporation's interest, from derivative suit on behalf of the corporation for mismanagement of the corporation. The business judgment rule does not immunize a company from non-derivative suits for breach of contract; nor is it a defense to the violation of the statutorily defined contingency reserve limit that is designed precisely to constrain the defendant company's exercise of its business judgment. *Babbitt Municipalities, Inc. v Health Care Service Corp.*, 64 N.E. 3d 1178, 1190-91 (Ill. App. 2016); *Willmschen v. Trinity Lakes Improvement Ass'n.*, 840 N.E.2d 1275, 1279, (Ill. App. 2005) (although "it may be good business judgment to walk away from a contract, … this is no defense to a breach of contract claim") (citation omitted).

## CLAIM FOR BREACH OF CONTRACT
### (On behalf of Plaintiff and the Class)

54.     Plaintiff incorporates herein the allegations contained in the preceding paragraphs.

55.     State Farm's participating policy contracts issued to Plaintiff and the other members of the Class each contain provisions making the policy eligible for the payment of annual dividends.  These contractual provisions impliedly and necessarily incorporate the requirements and limitations imposed by Section 243 because the "divisible surplus … allocated to [each] … policy as an annual dividend" in accordance with the contract language is determined by application of the statutorily prescribed percentage limit on the maximum amount of surplus a domestic insurance company may withhold from its participating policyholders in the form of a

16

"contingency reserve". In addition, the Illinois Contingency Reserve Law, including Section 243, is as a matter of law incorporated into State Farm's policy contracts with its participating policyholders.

56. In addition, the Illinois Contingency Reserve law is incorporated into State Farm's policy contracts with its participating policyholders by virtue of Article VIII of State Farm's bylaws, which expressly makes the discretion of its Board of Directors to calculate surplus with respect to both the contingency reserve and dividends to participating policyholders "[s]ubject to the limitations provided by law." BY-LAWS OF STATE FARM LIFE INSURANCE COMPANY (Amended as of March 13, 2000), Article VIII.

57. Plaintiff and the other members of the Class have fully performed their part of their insurance contracts.

58. State Farm has breached its participating policy contracts by failing to pay out the full amount of its divisible surplus due to Plaintiff and the Class in accordance with the Illinois Contingency Reserve Law.

59. State Farm's breaches of contract have damaged Plaintiff and the Class in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the Court to:

A.    certify this case as a class action;

B.    appoint Plaintiff as representative of the Class and appoint his counsel as Class Counsel;

C.    grant judgment in favor of Plaintiff and the Class against State Farm on Count One for damages calculated consistent with the Illinois Contingency Reserve Law;

17

D.      alternatively, grant Plaintiff declaratory relief on Count Two, declaring among

other things that State Farm's actions constitute a breach of its participating policy

contract;

E.      award Plaintiff his costs and disbursements incurred in maintaining this action,

including reasonable attorneys' and experts' fees and other expenses, and pre-and

post-judgment interest; and

F.      grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 6, 2017                    Respectfully submitted,

/s/ *Marvin A. Miller*

Marvin A. Miller
Matthew E. Van Tine
Miller Law LLC
115 S LaSalle Street, Suite 2910
Chicago, Illinois 60603
Phone: (312) 332-3400
Fax: (312) 676-2676

Jason B. Adkins (*pro hac vice* to be filed)
ADKINS, KELSTON & ZAVEZ, P.C.
90 Canal Street, 5th Floor
Boston, MA  02114
Phone: (617) 367-1040
Fax: (617) 742-8280

Andrew S. Friedman (*pro hac vice* to be filed)
Francis J. Balint, Jr. (*pro hac vice* to be filed)
BONNETT, FAIRBOURN, FRIEDMAN &
   BALINT, P.C.
2325 East Camelback Road, #300
Phoenix, AZ  85016
Phone: (602) 274-1100
Fax: (602) 274-1199

Mark A. Chavez (*pro hac vice* pending)
CHAVEZ & GERTLER LLP
42 Miller Avenue
Mill Valley, CA 94941
Phone: (415) 381-5599
Fax: (415) 381-5572

and

Joseph N. Kravec, Jr. (*pro hac vice* to be filed)
FEINSTEIN DOYLE PAYNE & KRAVEC, LLC
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Phone: (412) 281-8400
Fax: (412) 281-1007

Attorneys for Plaintiff

## APPENDIX A

§ 243. Contingency Reserves. (1) Any domestic life company may accumulate and maintain in addition to an amount equal to the net value of its participating policies computed according to the standard adopted by it under section 223, a contingency reserve not exceeding the following respective percentages of said net values, to-wit:

(a) When said net values are less than one hundred thousand dollars, twenty per centum thereof or the sum of ten thousand dollars, whichever is the greater.

(b) When said net values are greater than one hundred thousand dollars the percentage thereof measuring the contingency reserve shall decrease one-half of one per centum for each one hundred thousand dollars of said net values up to one million dollars; one-half of one per centum for each additional one million dollars up to ten million dollars; one-half of one per centum for each additional two million, five hundred thousand dollars up to fifteen million dollars; and, if said net values equal or exceed the last mentioned amount, the contingency reserve shall not exceed ten per centum thereof.

(2) As the net values of said policies increase and the maximum percentage measuring the contingency reserve decreases the company may maintain any contingency reserve accumulated under this section, although it may exceed the maximum percentage herein prescribed, but may not add to the contingency reserve when the addition will bring it beyond the maximum percentage.

(3) Nothing herein contained shall be construed to affect any existing surplus or contingency reserves held by any such company except that whenever the existing surplus and contingency reserves, exclusive of said net values and of all accumulations held on account of existing deferred dividend policies or groups of such policies, shall exceed the limit above mentioned it shall not be entitled to maintain any additional contingency reserve. However, for cause shown the Director may at any time and from time to time permit any company to accumulate and maintain a contingency reserve in excess of the limit above mentioned for a prescribed period not exceeding one year under any one permission, by filing in his office a decision stating his reasons therefor and causing the same to be published in his next annual report.

(4) This section shall not be construed as preventing the accumulation from the non-participating business of a contingency reserve for the benefit of non-participating policies.

## APPENDIX B

§ 224. Standard provisions for life policies.

(1) After the first day of July, 1937, no policy of life insurance other than industrial, group or annuities and pure endowments with or without return of premiums or of premiums and interest, may be issued or delivered in this State, unless such policy contains in substance the following provisions:

\*\*\*

(e) A provision that the policy shall participate annually in the surplus of the company beginning not later than the end of the third policy year; and any policy containing provision for annual participation beginning at the end of the first policy year, may also provide that each dividend be paid subject to the payment of the premiums for the next ensuing year; and the insured under any annual dividend policy shall have the right each year to have the dividend arising from such participation either paid in cash, or applied in reduction of premiums, or applied to the purchase of paid-up additional insurance, or be left to accumulate to the credit of the policy, with interest at such rate as may be determined from time to time by the company, but not less than a guaranteed minimum rate specified in the policy, and payable at the maturity of the policy, but withdrawable on any anniversary date, subject to such further provisions as the policy may provide regarding the application of dividends toward the payment of any premiums unpaid at the end of the grace period; and if the insured fails to notify the company in writing of his election within the period of grace allowed for the payment of premium, the policy shall further provide which of such options are effective.

\*\*\*